# EXHIBIT B1

## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

MAYOR & CITY COUNCIL OF BALTIMORE,
100 N. Holliday Street
Baltimore, Maryland 21202,

      Plaintiff,

      v.

MONEYLION TECHNOLOGIES, INC.
30 West 21st Street, 9th Floor
New York, New York 10010,

      Serve On:
      Registered Agent
      The Corporation Trust Company
      1209 Orange Street
      Wilmington, DE 19810

Defendant.

Case No. _____ C-24-CV-25-008340

JURY TRIAL DEMANDED

---

## MAYOR & CITY COUNCIL OF BALTIMORE'S COMPLAINT FOR CIVIL PENALTIES & INJUNCTIVE RELIEF

Plaintiff the Mayor and City Council of Baltimore, by and through its undersigned attorneys, ("Plaintiff," "Baltimore City," or "City") alleges as follows:

## INTRODUCTION

1.    MoneyLion Technologies, Inc. (d/b/a MoneyLion) ("MoneyLion," "Defendant," or "the Company") is a modern payday lender. The Company markets an earned wage access ("EWA") product known as Instacash that is, in fact, a disguised high-interest loan. MoneyLion makes high-frequency, small-amount, high-cost, short-term loans ("Instacash Advances") to consumers that trap them in a cycle of debt.

2.    If a consumer wants a $25 Instacash Advance, the consumer must link a debit account to a MoneyLion account, typically on a smartphone. If the consumer meets MoneyLion's lending criteria, MoneyLion will almost always charge a hidden fee of $4 to process the transaction right away. MoneyLion will also set a default "tip" of $5 and repeatedly pressure the consumer to reconsider if they indicate that they are not going to provide a tip. After 7 or 10 days, the Company expects, and almost 100% of the time gets, repayment by aggressively charging (and re-charging) the consumer's debit account. And at the end of the day, for a $25 cash advance with a default tip of $5 and a hidden processing fee of $4, MoneyLion will have charged an astounding, usurious rate of over 900% annual percentage rate (APR) for this transaction. MoneyLion's APRs are routinely 10 times the interest rates allowed under Maryland law: 33%.

3.    MoneyLion's digital-age lending scheme may be new but the financial industry's attempts to evade prohibitions on high-cost loans are not. No matter the label a lender puts on their product, courts in Maryland protect consumers from these loans: "It matters not in what part of the transaction it may lurk, or what form it may take--whether it reads six per cent. upon its face, with an understanding to pay an extra four per cent., or whether it be a pretended sale and lease, or

2

under whatever guise the lender--always fruitful in expedients--may attempt to evade the law, Courts of justice, disregarding the shadows and looking to the substance, will ascertain what in truth was the contract between the parties." *Andrews v. Poe*, 30 Md. 485, 488 (1869).

4.    The truth here is that Instacash Advances are loans, a fact that MoneyLion has relentlessly and deceptively hidden from consumers.

5.    While MoneyLion hides the fact that Instacash Advances are loans, they have every fundamental characteristic of a loan. MoneyLion provides funds, charges interest, and collects repayment nearly 100% of the time. MoneyLion even refers to Instacash Advances as "loans" and unpaid amounts as "principal" in internal documents. Yet when marketing to consumers, MoneyLion says the opposite.

6.    In its marketing to consumers, MoneyLion contrasts itself to other lenders by promising the ability to get up to $500 instantly with no interest through Instacash Advances. But these claims fall apart when consumers seek an Instacash Advance.

7.    Contrary to MoneyLion's representations, a consumer *must* pay interest to access instant funds. Consumers end up paying high APRs in fees and tips for Instacash Advances, a fact that MoneyLion hides in its marketing and in the very screens by which consumers navigate these transactions. These effectively mandatory fees frequently exceed the interest rates offered by payday and other high-cost lenders. Making matters worse, MoneyLion engineers ways to rack up as much interest as possible, including by misrepresenting the amount an Instacash user can obtain in a single transaction and repeatedly pressuring customers to provide "tips."

8.    The result is consumers who are trapped in a cycle of debt. As a consumer obtains Instacash Advances—one after another—their available funds for utility bills, rent, and food go

down. As a consumer's funds for utility bills, rent, and food dissipate, a consumer needs more Instacash Advances, and the cycle begins anew.

9.      Baltimore City law is clear: it is illegal for lenders like MoneyLion to use unfair, abusive, or deceptive trade practices. MoneyLion hooks consumers into a cycle of debt through a combination of usurious loans and misrepresentations. Its actions are unfair, abusive, deceptive, and contrary to public policy encapsulated by the Maryland Consumer Loan Law, the Truth in Lending Act, and the City of Baltimore's Consumer Protection Ordinance. Through this action, the City seeks to put an end to these practices and to hold MoneyLion accountable.

## PARTIES

10.      Plaintiff Mayor & City Council of Baltimore is a municipal corporation organized and existing under the laws of Maryland. Plaintiff is authorized, through the City Solicitor of the Baltimore City Law Department, to enforce laws for the protection of the public. Baltimore City Code Art. 7, §§ 22–24.

11.      Defendant MoneyLion Technologies, Inc. (d/b/a MoneyLion) is a Delaware corporation with its principal place of business at 30 West 21st St, 9th Floor, New York, New York, 10010.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction because the claims at issue arise under an ordinance enacted in the City of Baltimore. Md. Code Ann., Cts. & Jud. Proc. § 1-501 ("The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil. . . cases within its county[.]"). The amount-in-controversy exceeds the threshold for this Court to exercise exclusive jurisdiction. *Id.* §§ 1-501; 4-401(a).

13.     This Court may exercise personal jurisdiction over MoneyLion because the City's claims arise from or are related to MoneyLion's continuous (1) directed advertising to Maryland consumers through text, video, and image-based online advertisements, (2) directed marketing to Maryland consumers, (3) contracting with Maryland consumers to provide Instacash Advances, (4) extending loans to consumers, and (5) collecting debts from Maryland consumers. MoneyLion intended, knew, or is chargeable with the knowledge, that its out-of-state actions would have a consequence within Maryland. *Id.* § 6-102.

14.     Venue is proper in this Court because a substantial part of the acts or omissions giving rise to the claims occurred in the City of Baltimore. *Id.* § 6-201 ("[A] civil action shall be brought in a county where the defendant. . . carries on a regular business[.]").

## FACTUAL ALLEGATIONS

15.     In marketing to Baltimore consumers, MoneyLion has marketed Instacash Advances as "loan alternatives."[1] Unlike payday lenders, which are illegal in Maryland, and other lenders, which charge high interest, MoneyLion claims that "MoneyLion lets you **borrow up to $250 instantly**" with 0% interest through Instacash.

---

[1] MoneyLion, *Online Payday Loans in Maryland – Payday Advances When You Need Quick Cash*, available at https://web.archive.org/web/20250424100052/https://www.moneylion.com/learn/online-payday-loans-maryland/ (last accessed September 26, 2025) (emphasis in original).

16.    Other online advertisements are to the same effect, emphasizing that consumers can access an "advance" up to $500 instantly with no interest:



17.    At bottom, MoneyLion represents that Instacash Advances are not loans, are available instantly with no interest, and are available up to $500 at a time. In fact, Instacash Advances have every fundamental feature of loans and fees are effectively mandatory to access instant cash on demand. MoneyLion further misleads consumers by repeatedly and deceptively pushing consumers to provide "tips." After charging fees and tips, interest on Instacash Advances

adds up to astounding, usurious APRs. All told, through its deceptive and predatory tactics, MoneyLion traps Baltimore consumers in a cycle of mounting debt.

## A. Instacash Advances Are Loans

18.    While MoneyLion tells consumers that Instacash Advances are merely earned wage advances, not loans, its practices and internal treatment of Instacash Advances show the opposite.

19.    MoneyLion has specifically marketed Instacash Advances as "earned wage advances" or "EWAs," asserting that the Company is merely offering a worker early access to their wages. For example, MoneyLion states on its website: "Unlike traditional loans or even payday loans, an EWA payment provides access to money you've already earned, making it a safer alternative for managing short-term cash needs."[2] MoneyLion further represents that "Instacash by MoneyLion allows users to access up to $500 of their earned wages with no interest and no credit check." But this is not what Instacash Advances provide. MoneyLion has no relationship with a consumer's employer and has no data on how a consumer's actual paychecks are calculated for the day by which MoneyLion seeks repayment. MoneyLion's claims that Instacash Advances are somehow associated with consumers' wages are illusory. Instead, Instacash Advances are loans.

20.    MoneyLion's internal documents confirm that the Company treats Instacash Advances as loans. Internal documents reveal that MoneyLion refers to Instacash Advances as "single payment loans" and that the due date of the "loan should be on the next pay date." MoneyLion employees refer to amounts owed as "principal" and other MoneyLion internal documents refer to MoneyLion's "exposure" as the "principal exposed." Through MoneyLion's "loan books," MoneyLion also tracks impacts to its algorithms and modeling for Instacash

---

[2]    MoneyLion, *What is Earned Wage Access? The Complete Guide*, available at https://web.archive.org/web/20250924213815/https://www.moneylion.com/learn/earned-wage-access/ (last accessed September 26, 2025).

Advances. And in MoneyLion's SEC Form 10-K, MoneyLion refers to amounts owed for Instacash Advances as "principal amounts."

21.    MoneyLion's internal documents also reveal that, like other lenders, MoneyLion tracks default rates for Instacash Advances to maintain "target limits." It engages in what it considers "collections" activity and tracks loan-to-value ratios to assess whether and how Instacash is growing.

22.    Like other lenders, MoneyLion conducts a proprietary credit check that users must pass before receiving a loan. The purpose of this credit check, like any other lender's credit check, is to guard against non-payment.

23.    Further, MoneyLion's internal documents reveal that, like other lenders, MoneyLion sets and adjusts acceptable credit risk levels to prioritize repayment rates or loan volume. The Company reassesses and changes its underwriting criteria, including eligibility thresholds, to adjust repayment rates, changes which are approved by MoneyLion's Credit Committee. This Committee analyzes performance among Instacash users, including through "Credit Loss performance" analyses.

24.    If MoneyLion, after analyzing a user's spending history and other information, determines that the Company will be unable to obtain repayment, it will not issue an Instacash Advance.

25.    MoneyLion also engages in aggressive collections like other lenders, leading to a nearly 100% collections rate. Though MoneyLion represents that it will not seek legal action against Instacash users and will not engage in debt collection activities, \ MoneyLion acknowledges that it engages in collections in internal documents. MoneyLion refers to its

automated debit process as a "collections process" that happens through "automated collections" or the Company's "automated retry logic."

26.    MoneyLion requires access to either a RoarMoney account (a mobile debit account made available through MoneyLion) or an external bank account before it provides an Instacash Advance. MoneyLion's automated collections process is set after a user provides sufficient information for MoneyLion to detect at least three recurring deposits in either kind of account. Consumers agree and expect to repay the Instacash Advance on a date for which MoneyLion expects a recurring deposit.

27.    After MoneyLion takes note of the timing and amount of these recurring payments, MoneyLion can jump the line to access a consumer's pay, debiting the consumer for amounts owed, in addition to tips and fees. This way, MoneyLion ensures that it will get paid ahead of any utility company, landlord, or anyone else to whom the consumer owes money.

28.    MoneyLion has dedicated substantial resources to ensuring that its automated collections process results in payment as soon as possible after a paycheck hits a consumer's account. According to internal documents, the Company's founder has made near-instantaneous debiting a priority, messaging employees during testing that he needed to see "immediate debits upon payroll" and that the debiting "needs to be near instant." As MoneyLion was developing its repayment procedures, the founder complained that the process—which, at the time, had not processed MoneyLion's repayment, despite the fact that a consumer's payroll had been deposited just *one hour* prior—was too slow.

29.    Today, MoneyLion's process is as aggressively timed as ever to push aside any other creditors and put the Company first in line. MoneyLion now fields regular complaints that

9

its repayment debits are too early by attempting to charge a consumer before payroll is processed. These consumers then have to deal with costly overdraft and other fees.

30.    If a consumer does not have enough funds to repay MoneyLion its amount owed, fees, and tips, MoneyLion tries again and again to get its money. Training materials instruct employees to "retry payments every day until repaid" and if "there is not enough in the customer's accounts, we may take a partial repayment and try again the next day."

31.    For consumers who think twice and seek to revoke their repayment authorization, MoneyLion uses several tactics to make this process as impracticable as possible. The effectiveness of these tactics is borne out by the nearly 100% collections rate for Instacash Advances. While MoneyLion tells consumers that there is no obligation to repay an Instacash Advance, revocation is effectively illusory. MoneyLion ensures that consumers do not revoke authorization through a variety of tactics:

    a.  If a consumer revokes authorization, MoneyLion forbids the consumer from using Instacash moving forward.

    b.  MoneyLion provides no reminders or notifications in the MoneyLion app about a consumer's ability to revoke authorization after a consumer obtains an Instacash Advance.

    c.  MoneyLion makes revocation nearly impossible for its short-term loans by imposing a three-business-day notice requirement for revocation. If a consumer takes out a seven-day Instacash Advance on a Wednesday and their repayment date is the following Wednesday, the consumer must revoke authorization two days after seeking an Instacash Advance. Combined with the fact that the consumer would get

.

no notification of this deadline, MoneyLion ensures that revocations basically never happen.

d.  While MoneyLion streamlines the Instacash Advance process so that a consumer can obtain an Instacash Advance with one click, the process for revocation is convoluted and highly burdensome. A user must navigate multiple, confusing screens and remove all payment methods in the MoneyLion app. Doing so renders the rest of the app useless. So, if a consumer wants to use (or has used) another MoneyLion product, MoneyLion effectively forbids them from continued use. This process is particularly difficult for RoarMoney users, who are forced to abandon their bank accounts to revoke authorization for a low-dollar Instacash Advance.

32.    In sum, Instacash Advances are loans on which MoneyLion expects repayment, contrary to MoneyLion's representations that Instacash Advances are merely "earned wage advances."

**B. Instacash Users Cannot Access Instant Funds Without Interest.**

33.    While MoneyLion tells consumers that Instacash Advances are interest-free and instantaneous, Instacash users simply cannot obtain instant payments without substantial fees, which operate as interest.

a. *Fees are Effectively Mandatory for MoneyLion's Advertised Product.*

11

34.    MoneyLion charges transaction fees so that a consumer can get their Instacash Advance in minutes as follows:

| Disbursement Amount | RoarMoney Account | External Account |
|---|---|---|
| $5 or less | $0.49 | $1.99 |
| $10 – $25 | $1.99 | $3.99 |
| $30 – $45 | $2.99 | $4.99 |
| $50 – $65 | $3.99 | $5.99 |
| $70 – $85 | $5.49 | $7.49 |
| $90 – $100 | $6.99 | $8.99 |

35.    MoneyLion has marketed Instacash Advances as a single product through which consumers can get instant cash. But, in reality, there are two Instacash Advance products. Consumers can either choose a product with interest and instantaneous payment or a product without interest and without instantaneous payment. In other words, a customer can obtain an Instacash Advance of $50 for a $4.99 fee within minutes, or they can obtain an Instacash Advance of $50 for no fee in a matter of days.

36.    Even before adding any other fees or tips, "Turbo Fees" result in usurious rates of interest. If a consumer obtains a $50 Instacash Advance with a fourteen-day repayment schedule and a $6 Turbo Fee, the APR for a Turbo Fee alone is more than 300%.

37.     MoneyLion has misled Baltimore consumers by conflating these separate products and advertising a product that does not exist:



38.     Beyond straightforwardly stating in some advertisements that zero-interest Instacash Advances are available "instantly" for zero interest, MoneyLion drives the point home in a variety of ways. MoneyLion's choice of the brand name "Instacash" is not an accident. The very name of the product communicates to consumers that cash is made available instantly. MoneyLion also creates screenshots indicating that consumers can "get cash now" with the simple click of a button.

39.    These fees are also deceptively hidden. When a consumer seeks an Instacash Advance, MoneyLion presents a screen like the one below:



40.    This screen does not state that the Turbo Fee is optional. It does not even display the charge unless the consumer thinks to expand the "Total amount" owed.

41.    If a consumer does not pay a Turbo Fee, the consumer cannot access the advertised version of an Instacash Advance for its intended, core purpose: an instant source of cash. The consumer would instead access an inferior product, one not envisioned by the brand name "Instacash" or by the many advertisements noted above. In other words, the Turbo Fee is effectively mandatory.

42.    To access instant cash, a core feature of what Instacash offers, consumers cannot obtain zero interest, another core feature of what Instacash offers. The result, as described more fully below, is astounding interest rates.

14

b. *MoneyLion Deceptively Pushes Tips on Consumers as Effectively Mandatory.*

43.     MoneyLion repeatedly prompts users to provide a tip for each Instacash Advance, pressuring consumers to provide a tip to MoneyLion as if the Company were a bartender, taxi driver, or waiter. Unlike a lot of bartenders, taxi drivers, and waiters, MoneyLion is not dependent on tips to survive. However, this is what MoneyLion leads consumers to believe. MoneyLion repeatedly pressures consumers into providing tips, suggesting that if consumers do not pay tips, MoneyLion may not be able to provide the same services.

44.     The pressure begins with a default tipping option. A $25 Instacash Advance results in a default tip of $5 which, on its own, would result in a more than 500% APR with a fourteen-day repayment schedule:



45.     MoneyLion encourages consumers to click "Confirm" without looking at anything else. A consumer's eye is drawn to the large, green "Confirm" button instead of a smaller, grey dropdown menu, and a tip amount is preselected.

46.     According to internal MoneyLion documents, the predetermined amount is referred to as a "tip anchor." Anchoring is a well-known cognitive bias in which people rely heavily on the first piece of information they receive to make a decision.

47.     According to other internal MoneyLion documents, the Company uses many other "behavioral nudges and messaging" to push for more tips from consumers. These tactics include evaluating the use of different messaging and images to improve tipping rates. One of the primary ways MoneyLion improves tipping rates is to repeatedly urge consumers to provide a tip if they change the default tip to $0. After a consumer changes the default tip option to $0, MoneyLion presents a screen like the one below:



48.     Instead of acknowledging the consumer's choice, MoneyLion again urges the consumer to provide a tip for a default amount, which is preselected. MoneyLion does not even give the option to click "$0." The consumer only has a choice to provide a tip or promise that they will tip the next time they obtain an Instacash Advance.

49.     Amping up the pressure, MoneyLion leads consumers to believe that tips are necessary to ensure that Instacash Advances continue to exist. MoneyLion represents to consumers that tips are necessary to "ensure that we can keep offering 0% APR Instacash advances to you." Yet in its SEC Form 10-K, MoneyLion recognizes that tips are simply gross "banking revenue" not tied to the continued existence of Instacash.

50.     If MoneyLion's browbeating tactics are not successful for an initial transaction, the Company tries the same trick once more. If a consumer tries to obtain a second Instacash Advance, MoneyLion presents a screen like the one below at the beginning of the second process:



51.     Again, MoneyLion urges the consumer to provide a tip for a default amount, which is preselected. And again, MoneyLion does not give the option to click "$0." The consumer only has a choice to provide a tip or promise that they will tip the next time they obtain an Instacash Advance.

52.     The result of this onerous process, and MoneyLion's representations, is that consumers believe that tips are necessary for Instacash Advances to continue to exist. As a result, consumers provide tips. MoneyLion charges exorbitant interest through tips by making consumers believe that they are necessary.

**C.  MoneyLion Charges Astounding Interest Rates Through Fees and Tips**

53.     Even taking MoneyLion's promise of "zero interest" on its own, this representation also falls flat.

54.     MoneyLion routinely charges fees and tips that, taken together, represent far more than "zero" interest. Take, for example, a $50 Instacash Advance with a $4.99 fee and a tip of $2. This transaction, which was, according to data obtained by the New York Attorney General, the most common transaction in the State of New York between October 28, 2018 and December 21, 2023, represents a more than 350% APR. There is no reason to believe that these patterns are any different in Baltimore City.

55.     According to the same data, the average cost of credit across all Instacash Advances was more than 800% APR, with 95% of Instacash Advances carrying more than 100% APR, and more than half carrying more than 500% APR. By contrast, the APR limit for consumer loans under $1000 in Maryland is 33%.

18

56.     MoneyLion, in its marketing to Baltimore residents, has sought to compare itself favorably to other kinds of lenders.[3] These other kinds of lenders "offer predatory high-interest loans" that "can reach **triple digits in APR rates.**" MoneyLion has marketed itself as different from these lenders, noting that "0% is our favorite interest rate!" In fact, Instacash Advances almost always reach triple-digit APRs, and its average cost of credit is above the APR of the lenders against which MoneyLion contrasts itself.

57.     MoneyLion's APR appears to be higher than the industry average. The California Department of Financial Protection and Innovation conducted an analysis of EWA providers which found that the average APR for EWA providers with tipping averaged 334%.[4] More recently, the Center for Responsible Lending found that the average APR for an EWA was 383%, comparable to the average APR available from a payday lender, which is 391%.[5]

58.     Moreover, these fees and tips are not payments for a cost that MoneyLion incurs, contrary to what a reasonable consumer would infer. Fees are not used to process expedited transactions. Tips are not used for any purpose other than MoneyLion lining its pockets. Indeed, in its SEC Form 10-K, MoneyLion recognizes that fees and tips "are not distinct from the services of the Instacash advance." Instead, fees and tips are gross "banking revenue." The actual cost to MoneyLion for real-time transactions is, in fact, less than 5 cents for external users, a far cry from the up to $8.99 that MoneyLion charges consumers per transaction.

---

[3] MoneyLion, *Online Payday Loans in Maryland – Payday Advances When You Need Quick Cash*, available at https://web.archive.org/web/20250424100052/https://www.moneylion.com/learn/online-payday-loans-maryland/ (last accessed September 26, 2025).

[4] California Dep't of Financial Protection and Innovation, *2021 Earned Wage Access Data Findings* (Mar. 16, 2023), available at https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/2021-Earned-Wage-Access-Data-Findings-Cited-in-ISOR.pdf.

[5] Center for Responsible Lending, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA)* (Sept. 22, 2025), available at https://www.responsiblelending.org/research-publication/escalating-debt-real-impact-payday-loan-apps-sold-earned-wage-advances-ewa.

59.     This sleight of hand is even more egregious for RoarMoney users with a MoneyLion mobile debit account. For these users, MoneyLion does not bear any transaction costs because RoarMoney users' accounts are not external. Nonetheless, MoneyLion imposes a purported transaction fee on those users' requests for Turbo payments, and, in turn, penalizes any user's decision to not pay the transaction fee by *artificially slowing down* the transfer of funds to the user's RoarMoney account. Its internal documents reveal that the Company tags non-fee transactions as "Delayed Deposits" or "Delayed RM" for RoarMoney users. This artificial constraint further demonstrates that the Turbo fee is not tied to any actual costs borne by MoneyLion.

60.     In sum, MoneyLion charges huge amounts of interest through fees and tips, charges which are disconnected from the actual services that MoneyLion performs.

### D. MoneyLion Does Not Allow for $500 Instacash Advances at One Time

61.     Along with the instantaneous access to funds and zero interest, MoneyLion promises that a consumer can access a cash advance up to $500:




62.    A reasonable consumer would interpret "Get up to $500 cash advance" as offering a single cash advance worth up to $500. But $500 is only the aggregate limit of what MoneyLion allows. In fact, users can only access a maximum of $100 for any given transaction.

63.    The result is more fees and tips for MoneyLion and higher APRs for consumers. Consumers wanting their promised $500 cash advances must navigate a far-from-instantaneous process featuring multiple transactions and multiple opportunities for fees and tips.

64.    If a consumer wants to obtain $500 and the consumer has a $100 per-transaction limit with a fourteen-day repayment obligation, the consumer must make five separate transactions with five separate charges for fees and tips. If each transaction involves a $9 fee and a $5 tip, then the consumer will pay $70, resulting in an APR of over 350%. If the transaction were structured in the way MoneyLion has led consumers to believe, a consumer with a $500 one-time transaction, maximum $9 fee, and $5 tip, the consumer would pay $14, resulting in an APR around 75%.

65.    Due to artificial per-transaction limits, consumers necessarily engage in multiple transactions, one after the other, paying exorbitant fees and tips in the process.

**E. MoneyLion Provides Instacash Advances Without a License**

66.    While MoneyLion provides some consumer loans in Maryland through an entity known as MoneyLion of Maryland, LLC, this entity has not provided funds to Instacash users or collected repayment, fees, and tips from Instacash users in Maryland. Instead, MoneyLion provides funds and collects repayment from outside the State of Maryland, without a license.

**F. MoneyLion Hooks Users Into a Cycle of Debt**

67.    MoneyLion's tactics cause a cycle of debt for consumers. As a consumer obtains one Instacash Advance after another, a consumer is less able to afford utility bills, rent, and food.

As a consumer is less able to pay for utility bills, rent, and food, a consumer needs more Instacash Advances, and the cycle starts again.

68.    Consumers who need $25 or $100 at a time are not just living paycheck-to-paycheck. Because of MoneyLion, they are living day-to-day, with each day burdened with more fees and tips.

69.    Data analyzed by the Center for Responsible Lending shows that, for EWA providers like MoneyLion, "repeat borrowing is the norm, not the exception: nearly three-quarters of users (72%) not only come back for another loan, but do so quickly, taking out more than one loan within a two-week period."[6]

70.    These users are in a precarious financial position especially because repayment typically happens on payday, and MoneyLion ensures that it cuts to the front of the line, ahead of a consumer's landlord, utility company, and any other creditors whose payments are also typically due on a payday. This problem becomes compounded with increased usage. According to data analyzed by the Center for Responsible Lending, overdraft activity increases with more EWA loans. Users experiencing at least one overdraft rose from 9.7% before their first EWA loan to 14.1% in the three months after taking out their first EWA loan. Frequent pay more than three times in overdraft fees alone, compared to  less frequent users.

71.    MoneyLion has taken every possible step to fuel this problem and increase the frequency of Instacash Advances for each Instacash user. In turn, high-frequency lending leads to more fees and tips being collected for MoneyLion and even higher APRs for consumers.

---

[6] Center for Responsible Lending, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA)* (Sept. 22, 2025), available at https://www.responsiblelending.org/research-publication/escalating-debt-real-impact-payday-loan-apps-sold-earned-wage-advances-ewa.

72.     MoneyLion has recognized this issue in internal documents. The Company noted in the early stages of Instacash that "2 out of 3 users who have used Instacash have returned and used the product at least a second time." Subsequent analysis in February 2023 showed that up to 40% of Instacash users pay fees to the Company for *10 or more Instacash Advances per month*, 7% of Instacash users pay fees on *20 or more Instacash Advances per month*.

73.     20% of Instacash users obtain Instacash Advances at least every other day on average, a group which generates nearly half of fee and tip revenue for Instacash. This group has grown substantially over time, both in raw numbers and in the percentage of high-frequency users compared to other users. While this data is based on New York consumers, there is no reason to believe that these patterns are any different for Baltimore consumers.

74.     MoneyLion encourages dependency and higher APRs by forcing artificial, per-transaction limits. The more transactions a consumer has to go through, the more fees and tips MoneyLion collects.

75.     MoneyLion also encourages dependency through its "Boost" program by which the Company provides consumers temporary, low-dollar increases (usually around $25) in their Instacash funds available. This program provides Boosts for birthdays, Super Bowls, and holidays. This program has increased the frequency of transactions for consumers, leading to a 25% increase in Instacash transactions and associated fees and tips.

76.     MoneyLion goes further to enlist friends and family to send each other Boosts, typically for $5. This program has created a way for dependent users to trade Boosts with each other and, in turn, increase the frequency of their transactions.

77.    MoneyLion has taken no steps to mitigate the cycle of debt created by its practices. Instead, MoneyLion has taken every available step to increase addiction and dependency to the detriment of consumers. Through this action, the City seeks to stop this cycle of debt.

## COUNT I
### *Deceptive Trade Practices*

78.    The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

79.    The Baltimore Consumer Protection Ordinance, Baltimore City Code Art. 2, § 4 ("CPO"), protects consumers and others against "unfair, abusive, or deceptive trade practices," which are defined consistently with the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann, Com. Law, § 13-301. *See* Baltimore City Code Art. 2, § 4-1 (13).

80.    MoneyLion is a "person" or "merchant" engaged in the extension of credit and collection of consumer debt in the City of Baltimore. Baltimore City Code Art. 2, §§ 4-1(9)-(10), 4-2 (4)-(5).

81.    The MCPA identifies as deceptive trade practices any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" and "[f]ailure to state a material fact if the failure deceives or tends to deceive." Com. Law, § 13-301(1) & (3).

82.    The MCPA also instructs that, "in construing the term 'unfair or deceptive trade practices,' due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." Com. Law, § 13-105. Under the FTC Act, a trade practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.

24

Information is material to consumers if it is likely to affect a consumer's choice of or conduct regarding a product or service.

83.    At all relevant times, Instacash Advances were loans under the Maryland Consumer Lending Law ("MCLL"). Com. Law, § 12-201(e).

84.    In the alternative, even if Instacash Advances were not "loans," Instacash Advances were a "devise or pretense" by which MoneyLion collected interest or charges. Com. Law, § 12-303(d)(2).

85.    Until October 1, 2025, fees and tips paid through Instacash Advances were "interest" under Maryland law. Com. Law, § 12-201(e).

86.    Until October 1, 2025, Maryland law capped interest rates on short-term loans chargeable on Instacash Advances at 33%. Com. Law, § 12-206(a)(2)(1).

87.    Loans or advances are void and unenforceable in Maryland when a person contracts for any "interest, charge, discount, or other consideration greater than that authorized under State law." Com. Law, § 12-314(b)(1)(i)(1).

88.    MoneyLion has charged interest in excess of 33%, failed to obtain a license to provide consumer loans to Maryland consumers, and has enforced payment of principal, interest, and charges that are unenforceable under Maryland law. These violations of the MCLL are contrary to the public policy of the State of Maryland.

89.    MoneyLion's trade practices are deceptive. Without limitation, MoneyLion has violated the CPO by:

      a.    Misrepresenting Instacash Advances as a non-loan product prior to October 1, 2025;

    b.  Failing to represent the material fact that Instacash Advances were loans prior to October 1, 2025;

    c.  Failing to represent the material fact that Instacash Advances were void and unenforceable under Maryland law prior to October 1, 2025;

    d.  Failing to represent the material fact that MoneyLion has engaged in consumer lending activity without a license in violation of Md. Com. Law § 12-302;

    e.  Misrepresenting Instacash Advances as providing instant payment with zero interest prior to October 1, 2025 when, in fact, MoneyLion does not provide such a service to consumers;

    f.  Misrepresenting Instacash Advances as charging zero interest or "0% APR" prior to October 1, 2025;

    g.  Misrepresenting Instacash Advances as providing instantaneous access to $500 at a time when, in fact, consumers can only access funds in smaller increments like $25, $50, or $100; and

    h.  Misrepresenting the nature of tips as necessary to continue to provide consumers future access to Instacash Advances.

90.    The above representations and omissions were false, misleading, of the kind which has the capacity, tendency, or effect of deceiving or misleading consumers.

91.    Each misrepresentation and failure to disclose material facts by MoneyLion is a separate violation of the CPO.

92.    Each fee and tip collected by MoneyLion as a result of these unlawful trade practices is a separate violation of the CPO.

93.    Each day in which MoneyLion has operated without a license is a separate violation of the CPO.

94.    While engaging in the unlawful practices described herein, MoneyLion has, at all times, acted willfully. MoneyLion knew or should have known that its actions were of the nature prohibited by the CPO.

95.    As a result of the foregoing, the City seeks all legal and equitable relief as allowed by law, including civil penalties, injunctive relief, restitution, and disgorgement.

**COUNT II**
***Unfair Trade Practices***

96.    The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

97.    The MCPA instructs that, "in construing the term 'unfair or deceptive trade practices,' due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." Com. Law, § 13-105. Under the FTC Act, a trade practice is unfair if it is likely to cause substantial injury that is not reasonably avoidable by the consumer and is not outweighed by benefits to competition or consumers. Notably, the Federal Trade Commission has looked "to statutes or other sources of public policy to affirm that a practice is unfair." *Legg v. Castruccio*, 100 Md. App. 748, 769 (1994).

98.    A person cannot make "loans" of $25,000 or less for personal, family, or household purposes in Maryland unless the person has a license under the MCLL or is otherwise exempt from the MCLL licensing requirement. Com. Law §§ 12-302, 12-303(a).

99.    Through Instacash Advances, MoneyLion advances funds to Instacash users who, in turn, authorize MoneyLion to debit the amount advanced, along with fees and tips, by a date certain. These transactions are "credit" under the Truth in Lending Act ("TILA"), 15 U.S.C. §§

27

1601, *et seq.*, because MoneyLion provides consumers the right to defer payment of debt or incur debt and defer payment. 15 U.S.C. § 1602(f); 12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit, ¶ 2 ("Payday loans; deferred presentment").

100.    MoneyLion is a "creditor" under TILA because MoneyLion is a "person" regularly engaged in "credit" transactions with "consumer[s]." 15 U.S.C. §§ 1602(e), (f), (g), (i).

101.    Turbo Fees are effectively mandatory charges because these fees are deceptively presented and necessary to access Instacash Advances for their intended, core purpose.

102.    Tips are effectively mandatory charges because users are led to believe that tips are necessary for continued use of Instacash Advances and MoneyLion misleads and coerces consumers into providing tips through a highly onerous process.

103.    TILA requires MoneyLion to disclose, among other things, the "amount financed," "finance charge," "annual percentage rate," and "total of payments." 15 U.S.C. §§ 1638(a)(2), (3), (4), (5). The purpose of these disclosure requirements is so that "the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

104.    MoneyLion fails to disclose the "amount financed," "finance charge," "annual percentage rate," and "total of payments" as required under TILA. 15 U.S.C. §§ 1638(a)(2), (3), (4), (5).

105.    TILA also requires MoneyLion to "state the rate of [the finance charge] as an annual percentage rate" in its advertising. 15 U.S.C. § 1664.

28

106.    In (falsely) marketing the rate of a finance charge for Instacash Advances as "zero interest," MoneyLion fails to state the rate of the finance charge for its loans as an annual percentage rate.

107.    MoneyLion's trade practices are unfair. Without limitation, MoneyLion has violated the CPO by:

      a.  Engaging in consumer lending activity without a license in violation of Md. Com. Law § 12-302;

      b.  Charging interest and/or charges in excess of the rate allowed by the MCLL prior to October 1, 2025;

      c.  Collecting interest and/or charges on loans that were void and unenforceable prior to October 1, 2025;

      d.  Failing to represent interest and/or charges as an annual percentage rate in marketing and advertising, as required by TILA, 15 U.S.C. § 1664(c);

      e.  Failing to disclose the "amount financed," "finance charge," "annual percentage rate," or "total of payments" for Instacash Advances, as required under TILA, 15 U.S.C. §§ 1638(a)(2), (3), (4), (5);

      f.  Encouraging a cycle of debt through manipulation, deceptive marketing, and deceptive advertising; and

      g.  Engaging in manipulation, deceptive marketing, deceptive advertising, and scare tactics to force users to provide fees and tips to MoneyLion.

108.    These trade practices are likely to cause consumers substantial injury that is not reasonably avoidable and not outweighed by countervailing benefits.

109.    MoneyLion's actions are against public policy, as expressed through the MCLL and TILA.

110.    Each fee and tip collected by MoneyLion as a result of these unlawful trade practices is a separate violation of the CPO.

111.    Each day in which MoneyLion has operated without a license is a separate violation of the CPO.

112.    While engaging in the unlawful practices described herein, MoneyLion has, at all times, acted willfully. MoneyLion knew or should have known that its actions were of the nature prohibited by the CPO.

113.    As a result of the foregoing, the City seeks all legal and equitable relief as allowed by law, including civil penalties, injunctive relief, restitution, and disgorgement.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff City of Baltimore, respectfully requests that the Court enter judgment in its favor and against MoneyLion, as follows:

a.  The maximum amount of statutory penalties available under Baltimore City Code Art. 2, § 4-3(a), for each violation of Baltimore's CPO, Baltimore City Code Art. 2, § 4;

b.  Injunctive relief mandating that MoneyLion cease the exploitation of Baltimore City consumers by trapping them in a cycle of debt;

c.  Injunctive relief ordering that unlawful Instacash Advances be deemed void and unenforceable, and that MoneyLion return all principal, fees, and tips to Baltimore consumers;

d.  Injunctive relief requiring that MoneyLion adequately disclose the amount financed, finance charge, annual percentage rate, and total of payments for Instacash Advances;

e.  Injunctive relief requiring MoneyLion to reform its practices to accurately describe Instacash Advances;

f.  Any other relief as may be available and appropriate under the law or in equity.

31

## DEMAND FOR JURY TRIAL

The City demands a jury trial for all claims upon which a jury trial is available.

Respectfully submitted,

Date:                                    /s/
                                         EBONY M. THOMPSON
                                         City Solicitor

                                         BALTIMORE CITY LAW DEPARTMENT
                                         Ebony Thompson, City Solicitor (AIS 1312190231)
                                         Sara Gross, Chief Solicitor (AIS 0412140305)
                                         Thomas Webb, Chief Solicitor (AIS 1306190321)
                                         Christopher Sousa, Chief Solicitor
                                         (PHV forthcoming)
                                         Zachary Babo, Assistant Solicitor (AIS
                                         2211280023)
                                         Baltimore City Department of Law
                                         100 N. Holliday Street
                                         Baltimore, Maryland 21202
                                         T: 410.396.3947
                                         Sara.gross@baltimorecity.gov
                                         Thomas.webb@baltimorecity.gov
                                         Christopher.sousa@baltimorecity.gov
                                         Zachary.Babo@baltimorecity.gov

                                         E. Michelle Drake
                                         John G. Albanese
                                         (PHVs forthcoming)
                                         BERGER MONTAGUE PC
                                         1229 Tyler Street NE, Suite 205
                                         Minneapolis, MN 55413
                                         T. 612.594.5999
                                         jalbanese@bergermontague.com
                                         emdrake@bergermontague.com

                                         James Hannaway
                                         (PHV Forthcoming)
                                         BERGER MONTAGUE PC
                                         1001 G Street, NW, Suite 400 East
                                         Washington, DC 20001
                                         T. 202.869.4524
                                         jhannaway@bergermontague.com

*Attorneys for Plaintiff Mayor & City Council of Baltimore*

32