**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

MAYOR & CITY COUNCIL OF BALTIMORE,

Plaintiff,

v.

MONEYLION TECHNOLOGIES INC.,

Defendant.

Case No. 1:25-cv-3692-SAG

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND**</u>

The Mayor & City Council of Baltimore (the "City") has brought a local enforcement action against MoneyLion Technologies Inc. ("MoneyLion" or the "Company") for its deceptive and unfair trade practices. The Company characterizes itself as an Earned Wage Access ("EWA") company, not a lender, but the Instacash Advances it provides to Baltimore consumers have every fundamental feature of a loan. MoneyLion engages in unfair and deceptive trade practices by telling consumers that its loans are not loans, misrepresenting its fees, violating lending laws, and, in so doing, trapping Baltimore consumers in a cycle of debt.

This year, the General Assembly enacted a comprehensive statutory framework to regulate these loans and curb some of the EWA industry's worst abuses. This law is just the latest iteration of efforts to protect consumers from predatory loans: Maryland courts and the General Assembly have protected consumers from usurious loans since the colonial era. The City has also recently enacted a Consumer Protection Ordinance ("CPO") to further protect Baltimore residents from predatory companies and deceptive and unfair trade practices.

This case will necessarily involve difficult questions about these two overlapping state and

1

local statutory frameworks and, if left in federal court, would frustrate Maryland's and the City's interests in cohesive state and local policy. Federal courts *must* abstain from cases where difficult questions of state law implicate serious policy programs of substantial public import or where federal court review would disrupt a coherent state statutory framework. *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 719 (4th Cir. 1999). This abstention doctrine, known as *Burford* abstention, is designed to ensure the "proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943). This case presents a local enforcement action by the State's largest city that will help to define what constitutes an unfair or deceptive trade practice in an area of traditional state police power. It belongs in the Circuit Court for Baltimore City.

## BACKGROUND

### A.  Maryland's Long History of Regulating Loans

Since colonial times, Maryland has restricted usurious and predatory lending. *Nationstar Mortg. LLC v. Kemp*, 258 A.3d 296, 302 (Md. 2021). For hundreds of years, Maryland courts and the General Assembly have strictly enforced these laws to protect consumers no matter what label a lender applies to the loan or any associated fees. *Andrews v. Poe*, 30 Md. 485, 487, 1869 WL 3435 (1869) ("Courts have not hesitated, in every case, to tear off, with unsparing hands, the mask under which it has been attempted to conceal the usury, and to declare the true nature of the transaction.").

Over time, as new predatory lending schemes have sprung up, the Maryland legislature has acted in response, ultimately leading to the version of the Maryland Consumer Loan Law ("MCLL") currently on the books. In 1912, the General Assembly passed the predecessor to the MCLL to regulate "petty loan brokers" to "protect consumers of small loans[.]" *Price v. Murdy*,

2

198 A.3d 798, 800 (Md. 2018) (citation omitted). The General Assembly then replaced the 1912 law in 1918 in recognition of the "extensive business, in the making of small loans of three hundred dollars ($300) and less." *Liberty Fin. Co. v. Catterton*, 158 A. 16, 16 (1932). In 1945, the General Assembly acted again to regulate "the lending of sums of money not presently regulated by existing laws" in the Maryland Industrial Finance Law, which then became the MCLL in 1975. *Price*, 198 A.3d at 800.

The MCLL sets up both procedural and substantive protections for consumers. The MCLL applies to any "loan" of $25,000 or less, and it prohibits "the business of making loans" without a license. Md. Code Ann., Com. Law. §§ 12-302, 12-303(a)(1), 12-314(a)(4). The MCLL also caps interest rates for small, short-term consumer loans at 33%. Com. Law, § 12-206(a)(2)(1). More recently, the General Assembly passed HB 1294, which provides that EWA products are "loans" by amending Subtitle 3 of the MCLL to state, "a loan shall be subject to this Subtitle, whether or not elected, if the loan is Consumer-Directed Earned Wage Access under Subtitle 15." 2025 Md. Laws 847, § 12-319.

### B. Baltimore's Recent Consumer Protection Ordinance

To protect consumers in Baltimore, the City enacted the CPO in 2023. The CPO broadly prohibits "unfair, abusive, or deceptive trade practices' in the sale or offer for sale of consumer goods, consumer services, or consumer realty" within Baltimore. Balt. City Code Art. 2 § 4-2. The CPO incorporates many of the definitions and terms used in the Maryland Consumer Protection Act ("MCPA"), but the CPO applies only in Baltimore City.

The CPO allows the City Solicitor to bring civil actions on behalf of the Mayor and City Council of Baltimore. Through these civil actions, the City may seek civil penalties of up to $1000 per violation (including daily penalties for continuing violations) and to seek injunctive relief to

prevent ongoing harm to Baltimore residents. Balt. City Code Art. 2, §§ 4-3, 4-5(d). No court has yet applied the CPO's provisions.

### C.  Baltimore's Enforcement Action against MoneyLion

The City filed this case in the Circuit Court for Baltimore City against MoneyLion, seeking to enforce the CPO. The City's Complaint includes two counts: one count alleging deceptive trade practices and a second count alleging unfair trade practices. (ECF No. 1-2, "Compl." ¶¶ 78-113.) The City alleges that MoneyLion provides Instacash Advances to Baltimore consumers that have every fundamental feature of a loan: MoneyLion provides funds, charges interest, and collects repayment nearly 100% of the time. (*Id.* ¶¶ 5, 18-32.) When the effectively mandatory fees and tips that Baltimore consumers have paid are accounted for, the interest rates on these loans have exceeded the maximum 33% rate allowed under the MCLL. (*Id.* ¶¶ 33-60.)

The City alleges that MoneyLion has engaged in deceptive trade practices by, among other actions, misrepresenting Instacash Advances as something other than loans, misrepresenting that Instacash Advances have zero interest, and failing to represent that it has provided loans without a Maryland license. (*Id.* ¶ 89.) The City alleges that MoneyLion has engaged in unfair trade practices by, among other actions, engaging in lending activity without a Maryland license, charging usurious interest in violation of the MCLL, failing to comply with mandatory disclosures under the Truth in Lending Act ("TILA"), and engaging in manipulation and deception to trap consumers in cycles of debt. (*Id.* ¶ 106.) The City's case is an enforcement action that seeks injunctive relief and equitable remedies in the form of CPO penalties. (*Id.* at pp. 30-31.)

On November 10, 2025, MoneyLion filed a notice of removal to this Court. (ECF No. 1.) In its Notice, MoneyLion asserts diversity jurisdiction and federal question jurisdiction as the bases for subject-matter jurisdiction. (*Id.* ¶ 16.) The City timely seeks remand to the Circuit Court for

the City of Baltimore. 28 U.S.C. § 1447.

**LEGAL STANDARD**

Under *Burford* abstention, federal courts must decline jurisdiction if the "exercise of jurisdiction would demonstrate lack of comity or would interfere with state efforts to address significant policy issues." *City of Baltimore ex rel. Thompson v. DraftKings Inc.*, No. 25-cv-01487-SAG, 2025 WL 3151929, at *2 (D. Md. Nov. 10, 2025) (on appeal). This abstention is predicated on the "proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford*, 319 U.S. at 318.

A federal court must decline jurisdiction under *Burford* "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*"). Courts must decline jurisdiction in these circumstances regardless of whether a case otherwise involves diversity or federal question jurisdiction. *Burford*, 319 U.S. at 332 (noting that abstention is appropriate "whether its jurisdiction is invoked on the ground of diversity of citizenship or otherwise" and finding abstention appropriate despite federal constitutional claims); *NOPSI*, 491 U.S. at 359 (characterizing the federal claim as of "minimal significance").

**ARGUMENT**

This case is a local enforcement action that presents novel and complex questions at the intersection of state and local law. It requires application of a local consumer protection law that no state court has yet interpreted. It presents difficult questions of statutory interpretation for the

(1) MCLL, (2) the Baltimore CPO, and (3) the intersection of these two laws. In short, this case will "chart the course of state public policy" as it relates to consumer protection and lending in Maryland and therefore must remain in state court. *Johnson*, 199 F.3d at 721.

**A. This case presents difficult questions about the interpretation of the MCLL, which establishes a comprehensive statutory framework.**

The regulation of lending is "an area where state authority has long been preeminent." *DraftKings Inc.*, 2025 WL 3151929, at *5 (D. Md. Nov. 10, 2025) (quoting *Johnson*, 199 F.3d at 720). As described in detail above, since colonial times, Maryland has regulated lending activities and the State has a strong interest in doing so. *Nationstar Mortg. LLC*, 258 A.3d at 302 (noting that history of lending laws goes back to colonial times). The latest iteration of these efforts is HB 1294, a new law that regulates EWA companies like MoneyLion, which MoneyLion argues is in tension with the City's enforcement actions under the CPO. (ECF No. 1 ¶ 2.) Maryland's longstanding police power to regulate loans, combined with the novelty of HB 1294, weigh strongly in favor of *Burford* abstention here. State courts should have the first opportunity to weigh in on these substantial questions of state and local concern.

Maryland has recognized that the regulation of small loans, and the regulation of loans in exchange for a lender's access to a consumer's wages in particular, "is certainly within the police power of the state" because a business's activities "may injuriously affect the welfare of others." *Wight v. Baltimore & O. R. Co.*, 125 A. 881, 883 (Md. 1924) (noting the importance of regulating assignment of wages in exchange for money); *Liberty Fin. Co.*, 158 A. at 16 (noting that purpose of predecessor to MCLL was to protect "those who have little to offer as security except their *future earnings*") (emphasis added). Courts across the country recognize the same principle: regulation of small loans is a historic local police power and necessary to ensure the public welfare in any given state. *People v. Fairfax Fam. Fund, Inc.*, 47 Cal. Rptr. 812, 814 (Cal. Ct. App. 1964)

6

("The Small Loan Law of California is legislation designed for the public welfare."); *Mack Inv. Co. v. Dominy*, 1 N.W.2d 295, 297 (Neb. 1941) ("The legislature has the power to regulate interest, and legislation like that under consideration (the small loan act), is within the police power of the state.").

The MCLL, which traces back to 1912, is a comprehensive framework to protect consumers from usurious, small loans. In particular, Maryland law caps interest rates for short-term loans at 33%. Md. Code Ann., Com. Law, § 12-206(a)(2)(1). A lender cannot make consumer loans of $25,000 or less unless the lender has a license under the MCLL or is otherwise exempt from the MCLL licensing requirement. Md. Com. Law §§ 12-302, 12-303(a).

The market for MoneyLion and other, similar companies has grown dramatically in recent years, particularly as consumers have turned to smartphones for financial products. The CFPB estimated that around 10 million consumers accessed approximately $31.9 billion in EWA payments in 2022, with the number of transactions increasing dramatically from 2021. CFPB, *Data Spotlight: Developments in the Paycheck Advance Market* (July 18, 2024), available at https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/. While the CFPB has not updated its analysis, the EWA market has only grown with more EWA companies and more EWA transactions. One MoneyLion competitor alone has reported $6 billion in EWA payments to 4 million workers. Federal Reserve Bank of Kansas City, *As Earned Wage Access Grows, Oversight Tries to Catch Up* (May 15, 2024), available at https://www.kansascityfed.org/research/payments-system-research-briefings/as-earned-wage-access-grows-oversight-tries-to-catch-up/.

With rising popularity came rising scrutiny of EWA industry practices. The Maryland Office of Financial Regulation issued regulatory guidance that loan products providing early

access to wages are "loans" under the MCLL on August 1, 2023. (Ex. 1.) The Office of Financial Regulation noted that EWA companies must comply with the MCLL's substantive provisions and obtain licenses. (*Id.*) The Department of Labor then introduced HB 246 to "to make clear that companies offering cash advances to workers either directly or through an employer cannot charge exorbitant fees or add deceptive charges." (Ex. 2.)

The General Assembly did not enact HB 246 but included many of its provisions through HB 1294. Like HB 246, HB 1294 provided that EWA products are "loans" by amending Subtitle 3 of the MCLL to state, "a loan shall be subject to this Subtitle, whether or not elected, if the loan is Consumer-Directed Earned Wage Access under Subtitle 15." 2025 Md. Laws 847, § 12-319. While HB 1294 allowed EWA providers some leniency from some provisions of the MCLL, EWA products are still, and have always been, subject to the MCLL before and after HB 1294.

To resolve this Motion, the Court does not need to resolve the contours of past and present versions of the MCLL or whether MoneyLion violated or continues to violate the MCLL. For now, however, the City and MoneyLion agree that Maryland has enacted a "comprehensive scheme to regulate" the EWA market. (ECF No. 1 ¶ 1.) Federal court adjudication of this comprehensive scheme would risk "needless conflict with the administration by a state of its own affairs." *Meredith v. Talbot Cnty., Md.*, 828 F.2d 228, 231 (4th Cir. 1987). Thus, consideration of Maryland's new EWA law merits *Burford* abstention.

**B. This case is a local enforcement action that seeks a coherent policy related to consumer protection.**

Cases like this one are "not mere isolated disputes between private parties." *Burford*, 319 U.S. at 324. Instead, this case is an enforcement action brought by the largest city in Maryland to prevent unfair and deceptive trade practices. Balt. City Code Art. 2 § 4-2.  The need for abstention is most pressing in enforcement actions, to avoid the risk of federal courts "step[ping] uninvited

into the shoes of state courts and state enforcement agencies," leading to a "needless risk of tension between the two systems and conflicting mandates for those affected by state regulation." *Johnson*, 199 F.3d at 719, 725. The City's goal is to protect consumers and provide a remedy for the citizens of Baltimore. Balt. City Code Art. 2 § 4-5; (Compl. at pp. 30-31, Request for Relief (seeking equitable and injunctive relief including the return of legally void payments)). In other words, this case itself is an effort to establish a coherent policy with respect to a matter of public concern: the protection of consumers in the City of Baltimore. *NOPSI*, 491 U.S. at 361.

Further, like the MCLL, the CPO itself presents novel questions of local law with important public policy implications. *Id.*; *Naylor v. Case & McGrath, Inc.*, 585 F.2d 557, 564 (2d Cir. 1978) (holding that federal court should abstain from ruling on novel issues raised by newly enacted Connecticut Unfair Trade Practices Act). Because the CPO was enacted in 2023, several key provisions have yet to be ruled upon, in federal court or otherwise. Any decision from a federal court interpreting the CPO in the first instance would "necessarily try[] to predict" how state courts would decide the question, a practice the Fourth Circuit has rejected. *Johnson*, 199 F.3d at 720. There are numerous novel issues of purely local law that may be decided in this matter, among them the CPO's geographic reach, its interaction with state and local laws, and the method of calculating fines. The resolution of these questions will be fundamental in creating the regulatory scheme under which the CPO operates. Novel and fundamental questions like these should be resolved by a state court, not a federal court, in the first instance.

## C. This Court should not mediate the intersection of the CPO and MCLL.

These substantial questions of state and local law are especially prominent here because this case involves the intersection of two distinct and new statutory frameworks. The CPO and MCLL "have quite different purposes and impose quite different requirements." *Williams v. First*

*Gov't Mortg. & Invs. Corp.*, 176 F.3d 497, 500 (D.C. Cir. 1999) (holding that compliance with TILA did not absolve defendant from violations of local consumer protection act). The purpose of the MCLL is to protect consumers from unscrupulous lenders through imposing a statutory framework of protections and licensing, while the purpose of the CPO is to protect consumers from any unfair or deceptive trade practice whether those practices violate another law or not. These purposes and requirements are distinct but obviously overlap.

Determining the intersection of a newly amended state law and a new consumer protection ordinance should be for a state court to decide in the first instance. In a case involving online sports betting, this Court, in remanding the case, noted that if this Court were to maintain jurisdiction, "[b]y defining, in the first instance, the meaning of terms like 'unfair' and 'deceptive' in the context of the growing market of online gambling, this Court would be removing those decisions from the purview of the state courts before they have had any opportunity to weigh in on the CPO." *DraftKings Inc.*, 2025 WL 3151929, at *5. The same is true here. Here, as in *DraftKings*, the defendant is asserting that the City is using the "CPO to impose its own, more stringent local restrictions." *Id.*; (ECF No. 1 ¶ 2). And like in *DraftKings*, "Maryland's state courts are far better equipped to address, in the first instance, the complex state law issues and interests." *DraftKings Inc.*, 2025 WL 3151929, at *5. The Court should thus abstain from hearing the matter under *Burford.*

### D. The presence of TILA in the Complaint does not outweigh these concerns.

Application of the *Burford* abstention doctrine involves a balancing test between state and federal interests if a case implicates both interests. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996). On one hand is "the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court[.]" *Id.* On the other hand are "the State's interests

in maintaining 'uniformity in the treatment of an 'essentially local problem,'" and "local control over 'difficult questions of state law bearing on policy problems of substantial public import[.]'" *Id.* (citations omitted).

Because *Burford* involves a balancing test, the "mere presence of a federal question" in a complaint is not dispositive of whether *Burford* abstention is appropriate. *Johnson v*, 199 F.3d at 721-22. In *Burford* itself, for example, the plaintiff brought a Fourteenth Amendment challenge to the grant of an oil permit. 319 U.S. at 332. Abstention was still appropriate because the federal claim was of "minimal federal importance." *NOPSI*, 491 U.S. at 359 (citing *Burford*). A federal issue is of minimal federal importance and entitled to little weight if it is "entangled in a skein of state law that must be untangled before the federal case can proceed." *McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187, Cahokia, Ill*., 373 U.S. 668, 674 (1963). If a case presents a "quintessentially state character" and there is a "predominance of state law issues", then *Burford* abstention is appropriate. *Johnson*, 199 F.3d at 722, 723.

Here, the City's Complaint does not contain a claim under TILA. The City instead invokes TILA as a relevant public policy, along with the MCLL, that provide a basis for a court to conclude that MoneyLion's trade practices are unfair and deceptive under state and local law. Determining whether MoneyLion has, in fact, engaged in unfair trade practices will require the court to untangle the meaning of "unfair" and "deceptive" under state law as applied to TILA and the MCLL. *McNeese*, 373 U.S. at 674.

In addition, considering the extent to which the City relies on violations of the MCLL and other unfair or deceptive trade practices that are simply unfair or deceptive without reference to any other law, the TILA issue here is of "minimal federal importance" and has no meaningful impact on the *Burford* analysis. *NOPSI*, 491 U.S. at 359. The City can prevail on its unfair trade

practices claim if the court finds that MoneyLion violated the MCLL by collecting usurious interest or providing loans without a Maryland license or if the court determines that, independent of any law beyond the CPO, MoneyLion has engaged in other unfair tactics that trap Baltimore consumers in a cycle of debt. (Compl. ¶ 107(a)-(c), (f)-(g)); *Johnson v. Activehours, Inc.*, No. 1:24-CV-02283-JRR, 2025 WL 2299425, at *6 n.4 (D. Md. Aug. 8, 2025) (noting that violation of MCLL can give rise to violation of Maryland Consumer Protection Act). Weighing the state and local interests explained above against a federal issue that is not dispositive of the City's claims, the balance tilts heavily in favor of state and local interests.

Moreover, the federal issue is capable of easy resolution. TILA caselaw is substantially developed as applied to products like Instacash. Courts have consistently held that substantially similar EWA loans can be subject to TILA and that substantially similar charges like fees and tips are finance charges that must be disclosed to consumers. *Activehours, Inc.*, 2025 WL 2299425, at *8; *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935 (N.D. Cal. 2025); *Moss v. Cleo AI Inc.*, --- F. Supp. 3d ----, No. 25-879, 2025 WL 2592265, at *4 (W.D. Wash. Sept. 8, 2025); *Revell v. Grant Money, LLC*, --- F. Supp. 3d ----, No. 25-5994, 2025 WL 3167318, at *10 (N.D. Cal. Nov. 5, 2025); *Vickery v. Empower Fin., Inc.*, No. 25-3675, 2025 WL 2841686, at *7 (N.D. Cal. Oct. 7, 2025) (on appeal); *Golubiewski v. Activehours, Inc.*, No. 22-2078, 2025 WL 2484192, at *6 (M.D. Pa. Aug. 28, 2025). In other words, the federal issue is neither dispositive nor particularly difficult, unlike other state and local issues involved in applying the CPO to the MCLL.

Lastly, while the existence of federal question jurisdiction is not dispositive of *Burford* abstention, the lack of federal question jurisdiction also tilts the balance in favor of abstention. A federal issue is not necessarily raised because the City's unfair trade practices claim (the only claim that MoneyLion asserts as supporting federal question jurisdiction) does not "hinge on the

12

determination of a federal issue." (ECF No. 1 ¶ 36); *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 306 (4th Cir. 2021). Instead, as explained above, the City can prevail on this claim based on Maryland law or the plan language of the CPO. *McFeely v. Wells Fargo Bank, NA*, 568 F. Supp. 3d 553, 557 (D. Md. 2021) (finding no federal question jurisdiction in consumer protection case because of "several independent bases for liability under state law"). Federal question jurisdiction is also lacking because there is already a "uniformity of results" on the federal issue as explained above, thus making the federal issue insubstantial. *Burrell v. Bayer Corp.*, 918 F.3d 372, 386 (4th Cir. 2019). In sum, TILA is a small part of the City's Complaint, not dispositive of central issues in this case, and deeply entangled with state and local consumer protection standards. Its "mere presence" does not outweigh the substantial state and local issues at stake here. *Johnson*, 199 F.3d at 722.

### E. Maryland courts provide an adequate forum.

*Burford* abstention is only available "[w]here timely and adequate state-court review is available." *NOPSI*, 491 U.S. at 361. Maryland courts routinely hear cases interpreting the meaning of "unfair" or "deceptive" under the MCPA in light of other state and local laws. *Golt v. Phillips*, 517 A.2d 328, 332 (Md. 1986) (addressing Baltimore City housing ordinance violation giving rise to violation of the MCPA); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 281 (Md. 2007) (same). More common still are cases interpreting the MCLL. *In the Matter of Cash-N-Go, Inc.*, 286 A.3d 53, 78 (Md. 2022) (addressing lender's compliance with MCLL); *Pac. Mortg. & Inv. Grp., Ltd. v. Horn*, 641 A.2d 913, 922 (Md. Ct. Spec. App. 1994) (same). While there is a federal issue here, state "courts routinely hear and decide cases under the federal Truth–in–Lending Act[.]" *Easter v. Am. W. Fin.*, 202 F. Supp. 2d 1150, 1154 (W.D. Wash. 2002). Maryland state courts are more than capable of resolving this case.

13

## F. The City seeks equitable relief.

The Supreme Court has held that "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." *Quackenbush*, 517 U.S. at 731. The City's requested relief is entirely "equitable or otherwise discretionary" and the City does not seek "damages." *Id.*; (Compl. at pp. 30-31, Request for Relief); *see DraftKings Inc*., 2025 WL 3151929, at *2 (finding that relief sought under CPO is equitable or otherwise discretionary). The City also seeks comprehensive injunctive relief to prevent the future deceptive and unfair trade practices, which will be determined at the discretion of the Court. (Compl. at pp. 30-31, Request for Relief.) Thus, the nature of the relief sought here does not prevent *Burford* abstention.

## CONCLUSION

This case involves the intersection of a new state law and a new local ordinance, a local enforcement action, and a state policy concern that dates back to colonial times. The City has the authority to regulate unfair and deceptive trade practices that target its residents, and the State has the authority to regulate lenders. The appropriate forum to resolve these overlapping statutory frameworks is the Circuit Court for Baltimore City.

Date: December 10, 2025                    Respectfully submitted,

*/s/James Hannaway*
James Hannaway, *pro hac vice*
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, DC 20001
T. 202.559.9740
F. 215.875.4604
jhannaway@bergermontague.com

*/s/Thomas P. G. Webb*

14

BALTIMORE CITY LAW DEPARTMENT
Ebony Thompson, City Solicitor (AIS 1312190231)
Sara Gross, Chief Solicitor (AIS 0412140305)
Thomas P.G. Webb, Chief Solicitor
Federal Bar No. 18624
Christopher Sousa, Chief Solicitor
Zachary Babo, Assistant Solicitor (AIS 2211280023)
Baltimore City Law Department
100 N. Holliday Street
City Hall Baltimore, MD 21202
Phone: 410-396-5784
Fax: 410-547-1025
sara.gross@baltimorecity.gov
thomas.webb@baltimorecity.gov
christopher.sousa@baltimorecity.gov
zachary.babo@baltimorecity.gov

John G. Albanese, *pro hac vice*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
jalbanese@bergermontague.com

*Attorneys for Plaintiff Mayor and City Council of Baltimore*

15