**EXHIBIT 2**



SECRETARY PORTIA WU
1100 N. EUTAW STREET, 6th FLOOR
BALTIMORE, MD 21201

January 23, 2024

## TESTIMONY OF PORTIA WU

## SECRETARY, MARYLAND DEPARTMENT OF LABOR

## HB 246: EARNED WAGE ACCESS AND CREDIT MODERNIZATION - CONSUMER PROTECTION

**Dear Chair Wilson, Vice Chair Crosby, and Members of the House Economic Matters Committee,**

**I am pleased to introduce HB 246, the Department of Labor's Bill on Earned Wage Access and Credit Modernization.** Governor Moore is committed to making our state more fair and equitable for all Marylanders, and HB 246 supports this goal. The Department of Labor Office of Financial Regulation is proposing this legislation to make clear that companies offering cash advances to workers either directly or through an employer cannot charge exorbitant fees or add deceptive charges. Such products must comply with Maryland consumer loan laws and be transparent to workers about the costs of borrowing. This bill creates a level playing field so workers in our state who need cash before payday will not get price gauged and see their hard-earned dollars evaporate.

**The Department strongly believes that Earned Wage Access products act functionally as loans and therefore must be subject to the same regulatory requirements and guardrails as other consumer and payday loan products.** Maryland lawmakers have created a comprehensive and robust system for regulating consumer loans that has served consumers well for many years. HB 246 clarifies that Earned Wage Access products are loans subject to Maryland's consumer loan law and establishes rules governing these products. The bill gives workers using these pre-payday cash advances the same consumer protections they would have using other regulated loans products.

Earned Wage Access products are a way for workers to receive money in advance of a next paycheck and are increasingly common in our state and around the country. The advanced money often comes with various fees, and sometimes, workers are asked if they want to add a voluntary "tip." In a November 27, 2023 letter, the Consumer Financial Protection Bureau stated that Earned Wage Access products share "fundamental similarities with payday lending," and it is the Bureau's recommendation that these products should be subject to state laws regulating loans and consumer credit.[1] Maryland's Office of Financial Regulation agrees and issued

---

[1] **Consumer Financial Protection Bureau letter to California Department of Financial Protection and Innovation, Nov. 27, 2023,**
**https://files.consumerfinance.gov/f/documents/cfpb_comment-letter-to-dfpi-2023-11.pdf**



guidance last year that entities offering these pre-payday cash advances need to register with the state.[2]

The principle behind our approach is simple: Maryland law deems any transaction in which there exists any expectation of repayment to be a loan or extension of credit subject to licensing and regulation. Products that offer workers a cash advance before their next paycheck and require repayment—either directly from the employer or the worker themselves—clearly fall within the scope of that definition and therefore must abide by the same guidelines for loans as other vendors.

**Earned Wage Access Products are most often used by low-wage workers who repeatedly withdraw small amounts.** Marylanders in need of cash advances before payday are living paycheck to paycheck; these are lower-wage workers assisting us in retail shops, providing food in stores and restaurants, and taking care of our loved ones in jobs such as home healthcare aides. A GAO report on Earned Wage Access products cited data that "showed that about 75 to 97 percent of users reported earning less than $50,000 a year."[3] Other reports indicate that users of these products frequently have poor credit and are less likely to have access to lower-cost lending options.[4]  In Maryland a large percentage of lower-wage workers are likely to be workers of color: one-third of Maryland workers earning $40,000 a year or less in 2022 identified as Black – that's 440,000 Marylanders. Those earning these wages who identify as Hispanic or Latino comprise 203,000 Maryland workers or 15%.

Workers who use the products typically do so to access cash in increments of $100 or less. Data shows that workers who draw on these products are  likely to do so repeatedly. A 2023 GAO survey of Earned Wage Access providers and consumers found that "users of one direct-to-consumer earned wage access Financial Technology company used the service on average approximately 26 to 33 times per year during that same period."[5] These small loans can also come with costs and risks that borrowers may not be fully understand, and some groups appear to be particularly likely to find themselves in more costly arrangements: for example, one survey found that Hispanic and Latino users of EWA products were more likely to use "on demand" pay products that carried higher fees.[6]

As the Center for Responsible Lending testified before Congress, "Consumers who use these products can find themselves in a debt trap, leading borrowers to take out multiple loans over

---

[2] **Maryland Commissioner of Financial Regulation, Industry Advisory Regulatory Guidance, August 1, 2023, https://www.labor.maryland.gov/finance/advisories/advisory-ind-earnedwageaccess.pdf**

[3] **"Financial Technology: Products Have Benefits and Risks to Underserved Consumers and Regulatory Clarity is Needed," United States Government Accounting Office Report to Congressional Committees, March 2023, https://www.gao.gov/assets/820/818014.pdf**

[4] **See Earned Wage Access: An Innovation in Financial Inclusion?" Marshall Lux and Cherie Chung (June 2023), Appendix;**
[5] **GAO, https://www.gao.gov/assets/820/818014.pdf**

[6] **Lux and Chung (June 2023) page 12.**



consecutive pay periods."[7] In some cases, a worker may not have sufficient funds in their bank account and risk incurring overdraft fees as well.

These concerns are why consumer groups, civil rights organizations and worker organizations support regulation of these products to ensure that low-wage workers can keep their hard-earned pay.

**Some Earned Wage Access product fees result in effective interest charges several times more than what is permitted under Maryland law.** These products are marketed as affordable, but while the dollar amount may be low in nominal terms, the cost of only a few dollars assessed on these cash advances over a pay period can result in an annual percentage rate (APR) of 100% or more, far above the maximum interest rates allowed under Maryland's consumer lending laws. According to data from the California Department of Financial Protection and Innovation, "the average annual APR was 334% for tip companies and 331% for the non-tip companies" that offered these services to California workers. A 2023 Harvard Kennedy School working paper surveying products found APRs from 91% to over 500%.[8] In comparison, Maryland's Consumer Loan Law caps interest at 33% APR.

As noted in one report: "Since the typical fees charged by EWA firms are flat transaction-based fees, the cost to withdraw funds punishes low-value transactions; and because low-income users tend to do more low-value transactions, they end up paying more than higher-income users… Essentially, the fee structure is regressive, costing those who can least afford it the most while affluent users end up paying the least and are subsidized by the poor."[9] The fees charged may include basic services fees, expedite fees, subscription fees, and requests for gratuities.

**Any fees charged to workers for paycheck cash advances should be transparent and subject to existing limits on high-interest laws.** Many products employ "tip" or "gratuity" online screens to ask consumers for additional payments. These asks are misleading because such payments do not go to workers like a tip in a restaurant or other service industry job, they are retained by the company. The GAO report plainly stated, "[C]onsumer groups raised concerns that consumers may not recognize that tipping is optional and questioned whether a consumer's decision not to tip would decrease the amount of money advanced or wages that can be accessed in the future."[10]

Given such gratuities function as a de facto additional service charge, the costs paid by the worker must be included in calculating the effective interest the individual is paying. And there is evidence that these workers using these services frequently add a tip: in a recent poll

---

[7] **"Modernizing Financial Services Through Innovation and Competition," Mitria Spotser, Vice President, Center for Responsible Lending, Testimony to the United States House of Representatives, Committee on Financial Services, Oct. 25, 2023**

[8] **Lux and  Chung (June 2023) page 27.**

[9] **"Earned Wage Access: Faster wage payments disrupt the traditional payday," Michael Moeser,, page 14.**

[10]



conducted by Center for Responsible Lending, 70% of respondents who used the popular MoneyLion, Earnin or Dave apps reported leaving tips.[11]

By defining Earned Wage Access products as loans under Maryland law, this bill limits the costs and fees providers may charge a worker, and it codifies the Office of Financial Regulation guidance that providers are subject to licensure by the State. Additionally, it provides exemptions from licensure for employers and employer-connected providers who provide payroll cash advances at no cost to workers. The Attorney General and consumer groups propose taking the additional step of banning "tips" or gratuities altogether from Earned Wage Access Products.

**Finally, while the state of Maryland encourages technology innovation that expands access to financial services to the unbanked and underbanked,** we strongly believe that innovations can and should comply with basic consumer protections and not put vulnerable workers in even more precarious economic circumstances**.** The Moore Administration is committed to helping Marylanders in all communities to build wealth. Ready access to pay, ability to access loans to accumulate emergency savings, are critical to helping families meet both daily costs and unexpected financial needs. The Office of Financial Regulation is in the process of operationalizing the Community Investment Venture Fund created in the Access to Banking Act to work with financial services providers to encourage the development of financial products that will enable Maryland financial institutions to better serve the needs of the State's low-to-moderate income communities. Maryland Saves also provides incentives for small businesses to offer emergency savings accounts to individuals.

**In closing, Earned Wage Access products should be treated as consumer loans and come under the same regulatory guidelines.** Labor's Office of Financial Regulation supports innovation in financial products to help Marylanders build savings and accumulate wealth; however, those innovations must comply with our laws and retain basic protections for consumers and workers. This legislation would not prevent employers from offering these products, and in fact, the bill provides exemption from licensure for those companies who offer cash advances with no additional fees or costs to their workers. Currently, companies operating in Maryland can and do offer these products to their workers while bearing all or much of the cost—this ensures that workers have faster access to their pay and companies would still be able to offer these products to workers so they can meet daily expenses or other emergencies.

The Department of Labor remains committed to working with the General Assembly to support financial products innovation while continuing to protect consumers and workers. We urge a favorable report on HB 246.

**Sincerely,**

---

[11]**"Modernizing Financial Services Through Innovation and Competition," Mitria Spotser, Vice President, Center for Responsible Lending, Testimony to the United States House of Representatives, Committee on Financial Services, Oct. 25, 2023**



**Portia Wu, Secretary**

**Maryland Department of Labor**