IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **MAYOR AND CITY COUNCIL OF** | * | |
| **BALTIMORE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-25-03692** |
| | * | |
| **MONEYLION TECHNOLOGIES INC.,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

The Mayor and City Council of Baltimore (the "City") have, pursuant to the City's Consumer Protection Ordinance (the "CPO"), brought suit against MoneyLion Technologies Inc. ("MoneyLion"), alleging that MoneyLion, an Earned Wage Access ("EWA") provider, has engaged in unfair and deceptive trade practices "by telling consumers that its loans are not loans, misrepresenting its fees, violating lending laws, and, in so doing, trapping Baltimore consumers in a cycle of debt." ECF 27-1 at 2. The City originally brought suit in the Circuit Court for Baltimore City; MoneyLion then removed the suit to this Court. ECF 1. The City timely filed a motion to remand this case to state court, arguing for application of the abstention doctrine created in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). ECF 27. MoneyLion opposed remand, ECF 28, and the City filed a reply, ECF 29. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated herein, this Court shall deny the City's motion.

## I. BACKGROUND

In October, 2023, the City enacted the CPO, which prohibits—borrowing terms, definitions, and standards used in the Maryland Consumer Protection Act (the "MCPA"), Md.

1

Code Ann., Com. Law § 13-301 *et seq.*—"unfair, abusive, or deceptive trade practice[s]" in, *inter alia*, the extension of consumer credit and the collection of consumer debt within Baltimore City. Balt. City Code Art. 2 § 4-2. The CPO empowers the City Solicitor to initiate legal proceedings on behalf of the Mayor and City Council "in a court of competent jurisdiction" to seek to remedy violations of the ordinance through "injunctive relief and imposition and collection of civil penalties" of up to $1,000 per violation (including daily penalties for continuing violations). *Id.* §§ 4-3, 4-5. The City represents that no court has yet applied the CPO. ECF 27-1 at 3.

The Maryland Consumer Loan Law (the "MCLL"), Md. Code Ann., Com. Law § 12-301, *et seq.*, applies to any "loan" of $25,000 or less made for personal, family, or household purposes, prohibits "the business of making loans" without a license, and caps annual interest rates for small consumer loans at 33 percent. *Id.* §§ 12-302, 12-303(a)(1), 12-306(a)(2)(i). In May, 2025, the Maryland General Assembly passed House Bill 1294, effective October 1, 2025, which added Subtitle 15 ("Earned Wage Access") to Title 12 ("Credit Regulations") of the Commercial Law Article, *see* Md. Code Ann., Com. Law §§ 12-1501 to 12-1507, and amended the MCLL "[f]or the purpose of subjecting certain earned wage access products to the [MCLL] and other provisions that regulate entities that provide consumer credit," to state that "a loan shall be subject to this Subtitle, whether or not elected, if the loan is consumer-directed earned wage access under Subtitle 15." 2025 Md. Laws 847;[1] Md. Code Ann., Com. Law § 12-319.

---

[1] HB 1294 was codified at Md. Code Ann., Com. Law §§ 12-101 (amending the definition of "interest" and, in the first instance, defining "tip"); 12-128 (a wholly new section, titled "Lender tips"); 12-301 (defining "Interest" and "Tip" with cross-reference to § 12-101); 12-318 (a wholly new section, titled "Lender tips"); 12-319 (a wholly new section, titled "Loans Subject to Subtitle"); and 12-501 to 12-507 (constituting a wholly new subtitle regarding "Earned Wage Access"). Sections 12-128 and 12-318 have since been amended, by Senate Bill 94, 2026 Md. Laws 170.

On October 1, 2025—the same day that HB 1294 went into effect—the City filed suit against MoneyLion in the Circuit Court for Baltimore City, seeking injunctive relief and civil penalties for alleged deceptive (Count I) and unfair (Count II) trade practices under the CPO. *See* ECF 5. Specifically, the City has alleged that the "Instacash Advances" that MoneyLion provides to Baltimore consumers—an EWA product that MoneyLion represents "allows customers to obtain early access to wages that they have already earned," ECF 28 at 12—are, in essence, loans, and that the "effectively mandatory fees and tips" that MoneyLion charges and collects result in "interest" rates on the Instacash Advances in excess of 33 percent, contrary to MoneyLion's assertions that those Advances come without interest. ECF 27-1 at 4. In addition, the City alleges that MoneyLion engaged in lending activity without a Maryland license and failed to comply with mandatory disclosures under the Truth in Lending Act (the "TILA"). *Id.*

On November 10, 2025, MoneyLion removed the action to this Court on the bases of diversity jurisdiction and federal question jurisdiction. ECF 1.[2] The City filed the instant motion to remand on December 10, 2025. ECF 27.

## II.    LEGAL STANDARD

"Federal courts 'have a virtually unflagging obligation . . . to exercise the jurisdiction given them' by Congress." *Consumer Fin. Prot. Bureau v. Access Funding, LLC*, 270 F. Supp. 3d 831,

---

[2] The parties do not dispute that this Court has jurisdiction over this suit through diversity jurisdiction (the City being a Maryland resident and MoneyLion a Delaware and New York resident, and the amount in controversy being in excess of $75,000). In attempting to discount the weight to be given, in the *Burford* analysis, to the nested allegations of TILA violations, the City argues that federal question jurisdiction is lacking in this case, because "the City's unfair trade practices claim . . . does not hinge on the determination of a federal issue. . . . [T]he City can prevail on this claim based on Maryland law or the plan [sic] language of the CPO." *See* ECF 27-1 at 12–13 (internal quotation marks and citations omitted). As discussed below, because this Court finds abstention to be inappropriate in this case based on other factors independent of the presence of "federal issues," and because this Court otherwise has diversity jurisdiction, it need not settle the question of whether federal question jurisdiction also exists.

839 (D. Md. 2017) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). But there are certain "extraordinary and narrow exception[s]" to that general rule. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (internal quotation marks omitted). One is the *Burford* abstention doctrine, which counsels that federal courts must abstain in cases where their exercise of jurisdiction would demonstrate lack of comity or would interfere with state efforts to address significant policy issues. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Meredith v. Talbot Cnty.*, 828 F.2d 228, 231 (4th Cir. 1987) ("The underlying purpose of *Burford* abstention is to enable federal courts to avoid needless conflict with the administration by a state of its own affairs."). Since *Burford*, "[t]he Supreme Court has . . . carefully defined the areas in which such abstention is permissible, specifying two contexts in which the *Burford* doctrine applies." *Town of Nags Head v. Toloczko*, 728 F.3d 391, 396 (4th Cir. 2013) (internal quotation marks and citations omitted). "Where timely and adequate state-court review is available," a federal court "must decline" jurisdiction:

> (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case than at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of public concern.

*New Orleans Pub. Serv., Inc. v. Council of New Orleans* ("*NOPSI*"), 491 U.S. 350, 361 (1989) (internal quotation marks omitted). The Fourth Circuit has stated that, in determining whether *Burford* abstention is justified, courts must "balance the state and federal interests to determine whether the importance of difficult state law questions or the state interest in uniform regulation *outweighs* the federal interest in adjudicating the case at bar." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (emphasis in original). However, it has further noted, "both the Supreme Court and

4

this court have specifically rejected the view that a strong state interest alone could justify *Burford* abstention." *Id.* at 369.

### III.    DISCUSSION

In arguing for *Burford* abstention, the City emphasizes "Maryland's longstanding police power to regulate loans." ECF 27-1 at 6. However, the main thrust of the City's argument is that the novelty of two enactments implicated in this case—the CPO (passed in 2023 and not yet interpreted by any state court) and HB 1294 (passed in May, 2025 and amending the MCLL to include provisions expressly addressing Earned Wage Advances)[3]—means that any interpretation of their provisions—and of their intersection—will entail a difficult question of state law. *See* ECF 27-1 at 8–9.

As noted by MoneyLion, *see* ECF 28 at 34, the City appears to conflate novelty with difficulty. This Court reiterates that "there is no bright line rule that *Burford* abstention applies every time a case involves a newly enacted state or local law." *City of Baltimore ex rel. Thompson v. DraftKings Inc.*, No. SAG-25-01487, 2025 WL 3151929, at *5 (D. Md. Nov. 10, 2025) ("*DraftKings*"), *appeal filed*, No. 25-2372 (4th Cir. Nov. 14, 2025). Nevertheless, in support of its argument, the City invokes *Naylor v. Case & McGrath, Inc.*, where the Second Circuit abstained from adjudicating a case brought under the Connecticut Unfair Trade Practices Act (the "CT UTPA"), in part because "[t]he questions of state law presented . . . are not free of difficulty, and

---

[3] Though not raised in the parties' briefing, this Court notes that, while the City makes much of the novelty of the state law specifically governing EWA products, *see* ECF 29 at 11 ("The application of the newly amended MCLL . . . as applied to these products, would break new ground and is far from well-settled."), nowhere in its Complaint did the City make any reference to HB 1294 or the provisions of the newly enacted Subtitle 15 pertaining to EWA products. Rather, in seeking relief for violations occurring *prior to October 1, 2025*—the date upon which HB 1294 went into effect—the City appears to have exclusively cited provisions of the MCLL that either preceded or were not amended by HB 1294.

they bear importantly on the formation of enforcement policy around the *relatively new and recently amended* Unfair Trade Practices Act of the State, an important consumer protection statute." 585 F.2d 557, 564 (2d Cir. 1978) (emphasis added). *See* ECF 27-1 at 9; ECF 29 at 9. However, the statute at issue in *Naylor* is distinguishable from *both* the CPO and the MCLL amendments and new EWA provisions enacted in HB 1294.

First, the CT UTPA was an entirely new statute, substantively. While it drew its language from the Federal Trade Commission Act, "[t]he Connecticut Act differ[ed] radically from the Federal Act." *Id.* at 563. By contrast, the CPO does not create novel substantive obligations or prohibitions; its substance is expressly drawn from the MCPA. Thus, in assessing whether MoneyLion's practices were "deceptive" or "unfair," this Court would be applying definitions long settled under that statute and case law interpreting it. The City, itself, has acknowledged this point, *see* ECF 29 at 9, and, perhaps accordingly, it has not attempted to argue that interpretation of those terms under the CPO would present a difficult or novel question of state law. Thus, the CPO's "novelty" appears to be confined to its conferral on the City Solicitor of the ability to initiate legal action on behalf of the Mayor and City Council of Baltimore City, and to seek civil or criminal penalties.

However, the City argues that "the CPO's geographic reach, its interaction with state law, and the method of calculating fines[,] [n]one of [which] have ever been ruled on," are "novel issues of local law" that warrant abstention. ECF 29 at 9. This Court is not convinced. First, it is not clear what questions of the CPO's "geographic reach" would be decided in this case; the City itself has noted that while "[t]he CPO incorporates many of the definitions and terms used in the [MCPA], . . . the CPO applies only in Baltimore City." ECF 27-1 at 3. Further, that this Court might be the first to calculate penalties using the CPO's simple prescription ("not more than

$1,000" per violation, with each violation and each day upon which a violation continues being considered a separate offense, Balt. City Code § 4-3) is hardly a sufficient basis for applying the "extraordinary and narrow exception" of abstention from jurisdiction. Finally, this Court sees no difficulty in interpreting the "interaction" of the CPO and MCLL. As noted above, the main purpose of the CPO appears to have been to provide the City Solicitor, on behalf of the Mayor and City Council, with a City-specific enforcement mechanism based on the substantive provisions of the MCPA. That the CPO may apply to a broader universe of practices than the MCLL does not give it such a distinct purpose that interpreting the two in tandem presents a difficult question of state law requiring abstention.

Here, unlike the consumer protection statute at issue in *Naylor*, there is no dearth of case law interpreting the MCLL. As the City itself notes, while taking its current name in 1975, the MCLL has its roots in state legislation more than a century old. *See* ECF 27-1 at 2–3, 7. Indeed, federal courts have exercised jurisdiction over disputes under this law, including in conjunction with the MCPA. *See, e.g.*, *Bittinger v. DNF Assocs. LLC*, No. TDC-22-2461, 2023 WL 4868364 (D. Md. July 31, 2023) (deciding whether defendants were required to hold licenses under the MCLL, as that issue of statutory interpretation determined the "viability of all of Plaintiffs' claims," including under the Maryland Consumer Debt Collection Act and, by consequence, the MCPA), *appeal dismissed*, No. 23-1896, 2024 WL 808066 (4th Cir. Feb. 6, 2024); *Price v. Murdy*, No. GLR-17-736, 2018 WL 1583551 (D. Md. Mar. 30, 2018) (analyzing whether transactions at issue were "loans" under MCLL for which a license was required); *Manago v. Cane Bay Partners VI, LLLP*, No. 20-cv-0945-LKG, 2022 WL 4017299 (D. Md. Sept. 2, 2022) (claims brought under MCLL and MCPA), *appeal dismissed*, No. 22-2044, 2023 WL 10675680 (4th Cir. Nov. 7, 2023); *Johnson v. Activehours, Inc.*, No. 1:24-cv-02283-JRR, 2025 WL 2299425 (D. Md. Aug. 8, 2025)

(claims brought under MCLL and MCPA). And while HB 1294 did create a new subtitle of Maryland's Credit Regulations title with provisions specifically addressed to EWA products (*see* Md. Code Ann., §§ 12-1501 to 12-1507), (1) the City, itself, has asserted that "EWA products are . . . , and have always been, subject to the MCLL before and after HB 1294," ECF 27-1 at 8; and (2) this Court would not be the first in this District to retain jurisdiction over a dispute implicating these new statutory provisions. *See Activehours, Inc.*, 2025 WL 2299425; *see also Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 609 (D. Md. 2014) ("[T]he fact that Judge Garbis recently adjudicated . . . a putative class action against car sellers alleging the same violations asserted here—further counsels against *Burford* abstention.").[4]

The City refers to this Court's recent opinion in *DraftKings* to demonstrate that this Court has previously based abstention in part on its reluctance to be the first to opine on whether particular practices were "unfair" and "deceptive" under the CPO (in effect, under the MCPA).

---

[4] The City, while acknowledging *Johnson v. Activehours, Inc.*, and that courts in this District hear cases involving the MCLL, argues that "one decision does not make a state issue well defined, *particularly because this case does not involve recent amendments to the MCLL*." ECF 29 at 9 n.2 (emphasis added). The City does not identify which amendments it is referring to; however, if it is referring to those enacted by HB 1294, this Court notes that Judge Rubin, in *Activehours, Inc.*, expressly accounted for those amendments, ordering the parties to submit supplemental briefing regarding the bill for consideration in her analysis of the motion to dismiss. 2025 WL 2299425, at *1–2. This Court does note, however, that recently (more than two months after the City filed its reply in this case), the Maryland Legislature amended the MCLL through the passage of SB 94, which "subject[s] certain earned wage access providers and loan lenders to certain consumer loan requirements; and generally relat[es] to earned wage access." 2026 Md. Laws 170 (approved on April 28, 2026, with effective date of October 1, 2026). While these amendments may have pertinence to the ultimate resolution of the pending dispute—particularly in that they appear to amend §§ 12-128 and 12-318 to expressly prohibit lenders (and, in §§ 12-1504 and 12-1505, EWA providers, specifically) from engaging in certain tipping practices—they do not affect this Court's conclusions regarding the propriety of abstention. Moreover, the new § 12-1507 created by SB 94 includes a provision stating, "A provider may not directly or indirectly print, publish, distribute, or broadcast any false, misleading, or deceptive statement regarding the fees, rates, terms, or conditions of earned wage access"; this would indicate a unity of purpose between these provisions and the City's CPO, further undermining assertions of difficulty of interpreting interaction between the statutes.

ECF 27-1 at 10. In *DraftKings*, where this Court abstained from adjudicating a case seeking to apply the CPO to sports-betting providers, this Court noted that if it were to "defin[e], in the first instance, the meaning of terms like 'unfair' and deceptive' in the context of the growing market of sports gambling, this Court would be removing those decisions from the purview of the state courts before they have had any opportunity to weigh in on the CPO." *DraftKings Inc.*, 2025 WL 3151929, at \*5. The parallel that the City seeks to draw is that EWA products, like sports betting, are a recent and growing industry, and consequently, the subject of new state law not yet interpreted by state courts. *See* ECF 29 at 9, 10–11 ("Just like video gambling at issue in *Johnson*, issues surrounding EWA advances have been hotly contested in recent years, leading to new laws . . . . The application of the newly amended MCLL and newly enacted CPO, as applied to these products, would break new ground and is far from well-settled.") (citing *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 715 (4th Cir. 1999)).

However, as previewed above, the novelty of the practice at issue, and of a court's prospective characterization of it, does not, by definition, entail a *difficulty* of resolution warranting abstention. The case of *Arrington v. Colleen, Inc.*, No. Civ. AMD 00-191, Civ. AMD 00-421, 2000 WL 34001056 (D. Md. Aug. 7, 2000), while at a different procedural posture, is nevertheless instructive. In *Arrington*, a case about "so-called 'pay day loan[s],'"[5] the plaintiffs brought claims under TILA and RICO, and had invoked supplemental jurisdiction through assertion of state law claims brought under the MCLL and the MCPA. The defendant argued that the court should decline

---

[5] Note that, in its Complaint, the City refers to MoneyLion as "a modern payday lender," ECF 5 ¶ 1, while MoneyLion asserts that its "Instacash" "offers an alternative to payday loans," ECF 28 at 12. In January, 2024 testimony offered by Portia Wu (Secretary, Maryland Department of Labor), and attached to the City's motion, she noted, in support of a proposed bill (HB 246) that served as the precursor to HB 1294, that the Consumer Financial Protection Bureau had likened EWA products to payday loans. ECF 27-4 at 2.

to exercise supplemental jurisdiction on the basis that the MCLL claims involved novel and complex questions of state law. The court rejected defendant's argument. While *noting that the question of whether the transactions at issue were consumer loans and thus regulated by the MCLL "has not been specifically addressed by the Maryland Court of Appeals,"* the court stated:

> This does not mean, however, that the question raised by these cases invariably presents a "novel and complex" issue of law. Quite the contrary, there are instances, of which I am convinced this is one, where the Court of Appeals has not had occasion to rule on the particulars of an issue but where its prior cases in the same or a related context . . . provide, in conjunction with the relevant portions of the Maryland Code, . . . more than sufficient information upon which a federal court may reliably predict how the Maryland Court of Appeals will resolve open questions of state law.

*Id.* at \*3 (collecting cases) (internal citations omitted); *see also Jimenez-Orozco v. Baker Roofing Co.*, No. 5:05-CV-34-FL, 2006 WL 8438693, at \*7 (E.D.N.C. Mar. 28, 2006) ("[A]lthough plaintiff avers that his state law claims present questions of statutory or regulatory interpretation that no North Carolina court has decided, this does not necessarily render these issues 'novel or complex.'") (citing *Arrington*). Judge Davis's reasoning regarding the federal court's exercise of jurisdiction over novel state law claims related to consumer loans under the MCPA and MCLL is compelling, notwithstanding the distinct procedural posture. As the City itself recognizes, HB 1294 "is just the latest iteration of efforts to protect consumers from predatory loans: Maryland courts and the General Assembly have protected consumers from usurious loans since the colonial era." ECF 27-1.[6] Further, the field of consumer protection and lending has been addressed by several federal statutes, including one (TILA) which the City expressly invokes in its Complaint, and which Maryland regulations regarding "Unfair and Deceptive Trade Practices" expressly

---

[6] In this way, too, the enactments at issue here differ from those in *DraftKings*. The promulgation of a complex administrative scheme to regulate sports betting was not simply the "latest iteration" of regulation in the area of gambling; it was undertaken in response to a statewide referendum legalizing the activity.

reference. *See* Md. Code Regs. ("COMAR") § 09.03.02.05(A)(1) ("Each consumer loan licensee shall comply with all provisions of Regulation Z, promulgated under the Federal Consumer Credit Protection Act, Truth-in-Lending, that relate to the advertising of credit terms."). Thus, it does not appear to this Court that the questions raised in the City's state law claims are beyond this Court's competence.

Moreover, this Court's concern, in *DraftKings*, about being the first to determine the fairness or deceptiveness of practices associated with the state's new sports betting industry was just one factor—and an inseparable one—from others upon which this Court ultimately based its decision to apply the extraordinary exception of abstention. This Court focused on the risk of its disposition potentially disrupting the state's efforts to establish a coherent sports gambling policy through comprehensive and complex regulation. While this Court, of course, did not recognize an "automatic 'gambling' abstention doctrine," *DraftKings*, 2025 WL 3151929, at *5, it highlighted that Fourth Circuit precedent has expressly recognized the important state interest in regulating gambling, and its relevance to the application of *Burford*. *Id.* And, the regulatory scheme involved in *DraftKings* was exceedingly complex.

Without going so far as to accept MoneyLion's argument that the existence of a "complex state administrate scheme" is a *pre-requisite* to Burford abstention, this Court recognizes that the existence and implication of a comprehensive state regulatory scheme certainly increases the risk of the kind of disruption that *Burford* abstention is intended to mitigate; thus, its existence—or absence—is certainly a factor to be given substantial weight in the abstention analysis.

In assessing that factor here, it is worth identifying the actual "scheme" with which the City asserts potential interference. First, the City does not appear to attempt to rebut MoneyLion's argument that the CPO does not, itself, establish any sort of complex administrative regime, *see*

ECF 28 at 21–22.[7] And, as noted, the MCLL has been interpreted in federal court without concerns about proper comity being afforded to the State. Thus, the practical question appears to be whether the amendments to the MCLL and the EWA provisions enacted by HB 1294, specifically, constitute an effort to establish coherent policy regarding EWA products that would be disrupted by this Court's adjudication of this case.

In its notice of removal in this case, MoneyLion expressly characterized HB 1294 as enacting a "comprehensive" scheme. *See* ECF 1 ¶¶ 1 ("Maryland has specifically recognized the value of EWA products like Instacash, recently *promulgating a comprehensive scheme to regulate them.*") (emphasis added), 11 ("Maryland . . . has enacted a comprehensive regulatory framework for EWA products that went into effect on October 1, 2025.") (citing HB 1294). But in opposing the City's motion to remand, MoneyLion has struck a different tone, arguing that these newly-enacted provisions from HB 1294, and the MCLL more broadly, constitute a "straightforward statute, imposing a limited number of discrete substantive and procedural requirements, . . . not the type of complex regulatory scheme with which *Burford* is concerned." ECF 28 at 25 (citing assorted provisions).

Upon review, to the extent that the newly enacted provisions of HB 1294 (and its implementing regulations) govern the City's claims, they do not appear to create an administrative scheme of greater complexity than others in the consumer protection space regularly invoked in federal courts, and certainly do not approach the level of complexity of the scheme at issue in *DraftKings*. The licensing requirement codified at § 12-502 in large part incorporates existing

---

[7] Nor could it, seeing as the short (seven section) ordinance gets most of its substance through incorporation of the MCPA by reference. This Court agrees with MoneyLion that the primary novel function of the CPO appears to be to allow the City Solicitor to initiate a cause of action otherwise reserved for the State and consumers under the MCPA.

requirements under Title 11, Subtitle 2 of the Financial Institutions Article, simply extending them to EWA providers, and exempting licensed EWA providers "from other provisions of State law governing lending, credit, or debt." Otherwise, the provisions of subtitle 15 (1) set forth certain discrete "duties" of and "restrictions" on EWA providers in their interactions with consumers, including requirements of certain clear and conspicuous disclosures and restrictions on receipt of interest, *see* §§ 12-1503, 12-1504; (2) allow for EWA providers to charge specific fees for delivery or expedited delivery of EWA, § 12-1505; (3) require EWA providers to submit annual reports to the Office of Financial Regulation "to assess the size and status of the earned wage access market in the State," § 12-1506; and (4) reserve the OFR Commissioner's authority to adopt regulations to carry out the subtitle. § 12-507. Further, while this Court agrees with the City that the mere *number* of regulations is not determinative of a scheme's complexity or "whether a state has endeavored to establish a coherent state policy," ECF 29 at 12, here, the disparity between the regulations implicated by this suit and those implicated in *DraftKings* is stark. An entirely new, and comprehensive, subtitle was added to Maryland's regulatory code in January, 2022 to regulate sports wagering. *See* 49:1 Md. Reg. 16 (adopted Jan. 3, 2022; effective Jan. 13, 2022) (creating Subtitle 10, "Sports Wagering Provisions," within Title 36 of COMAR).

However, complexity is not the determinative question for the *Burford* analysis, even in cases where complex administrative schemes are implicated. *See NOPSI*, 491 U.S. at 362 ("[W]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process."); *Chambers*, 43 F. Supp. 3d at, 609 ("[T]he mere presence of a complex state or local regulatory scheme does not mandate abstention."); *DraftKings*, 2025 WL 3151929, at *5 ("[F]ederal courts should not invoke *Burford* abstention simply because a case involves . . . [a] highly regulated

13

industry."). Nor is the potential for impact on or conflict with that scheme. *See NOPSI*, 491 U.S. at 362 ("*Burford* . . . does not require abstention . . . even in all cases where there is a potential for conflict with state regulatory law or policy."); *Access Funding, LLC*, 270 F. Supp. 3d at 840 (rejecting defendants' apparent suggestion that "it is inappropriate for a federal court to hear a case that might impact a state administrative scheme": "Neither the Supreme Court nor the Fourth Circuit has taken such an expansive view of *Burford*."). Thus, even if this Court were to conclude that the newly-amended MCLL did create an appreciably complex regulatory scheme, this Court would still need to assess (1) the function of that scheme toward the establishment of a coherent policy pertaining to EWA products—assuming those products constitute a "matter of substantial public concern"—and (2) the potential for a federal court's disposition of the issues presented in this case to *disrupt* those efforts.

The City, apart from largely conclusory statements asserting that the CPO and amended MCLL "provide a web of requirements that apply to EWA advances, [that] a federal court will have to disentangle," ECF 29 at 11, and a "detailed web of substantive and procedural rules," *id.* at 12, has not identified how federal review of this case would disrupt Maryland's efforts to establish a coherent policy regarding EWA products. HB 1294 appears to have essentially reflected the State's intention to subject EWA products to the same requirements as other consumer loans, which have long been governed by statutory and regulatory frameworks with which federal courts routinely engage. And while both parties acknowledge that the Maryland Office of Financial Regulation may initiate enforcement actions for violations of the MCLL, the City has offered no indication of how this case would unduly interfere with that process. Accordingly, the

circumstances of this case do not warrant this Court's application of the "extraordinary and narrow exception" of abstention under *Burford*.[8]

## IV.    CONCLUSION

For the reasons set forth above, the City's motion to remand, ECF 27, will be DENIED. A separate Order follows.

Dated: June 1, 2026                                          /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge

---

[8] In light of these conclusions, this Court need not reach the question of the extent to which the City's allegations of TILA violations raise federal questions weighing against abstention. In addition, because this Court is declining to abstain, it need not resolve the parties' dispute regarding the nature of the relief sought by the City (specifically, civil penalties) and its consequences for abstention.